IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| NANCY K. SHERLOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-260-GMS |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM**

### I. INTRODUCTION

On April 20, 2009, plaintiff Nancy K. Sherlock ("Sherlock"), filed this action against defendant Michael J. Astrue, former Commissioner of Social Security Administration ("the Commissioner"),[1] for review of the final decision denying her application for a period of disability and disability insurance benefits ("DIB").[2] (D.I. 1.) Sherlock brought this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Presently before the court is Sherlock's motion for summary judgment and the Commissioner's cross-motion for summary judgment. (D.I. 16; D.I. 20.) For the reasons that follow, the court will deny Sherlock's motion and grant the Commissioner's cross-motion. As such, the court affirms the decisions of ALJ Showalter and the Appeals Council. The court's reasoning follows.

---

[1] Carolyn W. Colvin replaced Michael J. Astrue on February 13, 2013, after Sherlock initiated this action. Although, pursuant Federal Rule of Civil Procedure 25, Carolyn W. Colvin should be substituted for Michael J. Astrue, pursuant to 42 U.S.C. § 405(g), no further action is necessary to continue this action.

[2] Pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–433, Sherlock filed an application for DIB on April 6, 2006, alleging disability as of October 30, 2003. (D.I. 15 at 8.) Sherlock's application was denied initially on August 8, 2006, and again upon reconsideration on May 16, 2007. (*Id.*) Subsequently, Sherlock, her husband, and Adina Leviton, an impartial vocational expert, testified before the Administrative Law Judge, Judith A. Showalter ("ALJ Showalter"). (*Id.*) On June 25, 2008, ALJ Showalter issued a decision finding that Sherlock was not disabled and not entitled to benefits. (*Id.* at 17.) The Appeals Council denied Sherlock's request for review. (*Id.* at 1–3.)

## II. BACKGROUND

Sherlock possesses a high school education. (D.I. 15 at 26, 128.) Up until October 30, 2003—the start-date of Sherlock's claimed period of disability—she worked as clerk for an insurance company, performing semi-skilled tasks. (*Id.* at 124.) Sherlock concedes that her alleged disability did not force to stop working; rather, her position was terminated when her employer moved towards a paperless filing system. (*Id.* at 29–30, 123.) Sherlock nonetheless argues that she has been unable to work since October 30, 2003, because of her mental impairments. Since 1980, Sherlock has received outpatient psychiatric treatment for bipolar disorder. (*Id.* at 178.) At the time of Sherlock's hearing before ALJ Showalter in 2008, she was fifty-four years old.

### A. Medical History

During the relevant time period, Sherlock received regular outpatient mental health treatment with Dr. Mahendra Patel.[3] Sherlock's bipolar disorder manifested as anxiety and mood swings, and rarely Sherlock also showed symptoms of psychosis. (*Id.* at 209–17, 252–56.) Dr. Patel's regular progress notes—throughout the period in question: 2003 to 2008—indicate that he believed Sherlock's symptoms were largely mild and under "good control." (*Id.* at 252–56.) Dr. Patel also prescribed Sherlock various psychotropic medications to manage her symptoms, including lithium, Zoloft, and BuSpar. (*Id.* at 199.)

Separate from Sherlock's regular treatment with Dr. Patel, Dr. Brian Simon, a Delaware state-agency psychologist, evaluated Sherlock on July 18, 2006, in order "[t]o determine

---

[3] Dr. Patel began providing care for Sherlock starting in 1999. (D.I. 15 at 33.) The relevant time period for the purpose of calculating benefits, however, begins when the application for DIB is filed. *See* 20 C.F.R. § 416.335 ("[T]he earliest month for which we can pay you benefits is the month following the month you filed the application.").

2

[Sherlock's] level of functional problems for disability determination purposes." (*Id.* at 178.) Dr. Simon noted that Sherlock "did present as being rather odd, and seem[ed] to be presenting with a number of symptoms suggestive of schizotypal personality disorder." (*Id.* at 181.) Nonetheless, Dr. Simon noted that Sherlock did not have significant problems interacting with others, that she was able to care for herself and manage expenses, and that she did not appear to have "any significant difficulties being able to maintain a job." (*Id.*) Dr. Simon recommended ongoing outpatient treatment with Dr. Patel and assessed Sherlock with a GAF score of 57.[4] (*Id.* at 182.) On August 4, 2006, a second state-agency psychologist Dr. D. Fulgate completed a "psychological functional capacities evaluation form" for Sherlock, noting mild to moderate impairments in functioning and stating that she was "able to meet the basic mental demands of simple work." (*Id.* at 198.) Dr. Carlene Tucker-Okine, yet another state-agency psychologist, reviewed and affirmed the findings of Dr. Fulgate on May 16, 2007. (*Id.* at 241.)

Beyond her outpatient care, Sherlock was also hospitalized and received inpatient mental health treatment on two occasions. From August 24 to September 6, 2006—shortly after her evaluations with Dr. Simon and Dr. Fulgate—Sherlock was admitted to the Rockford Center in Newark, Delaware. (*Id.* at 199–204.) Sherlock expressed that she "had low energy" and "was not feeling safe." (*Id.* at 199.) Financial problems appeared to be contributing to her symptoms. (*Id.*) She was assessed with a GAF score of 25 upon admission.[5] (*Id.*) Dr. Praful Desai,

---

[4] GAF stands for "Global Assessment of Functioning"; it is a statistical tool used by healthcare providers to measure a person's ability to function. The scale ranges from 1 to 100, in increasing ability to function. Descriptions of the meanings underlying the various GAF scores are taken from the *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

GAF scores from 51 to 60 indicate:
> Moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

[5] GAF scores from 21 to 30 indicate:

3

Sherlock's treating physician while at the Rockford Center, stated that Sherlock's discharge goals were: (1) control of depression, (2) control of bipolarity, (3) adjust medications, (4) restore sleep pattern, and (5) improve level of functioning. (*Id.* at 204.) At the time of discharge, Sherlock was assessed with a GAF score between 55 and 70, which roughly corresponds to her pre-hospitalization functioning level.[6] (*Id.* at 199.)

Sherlock was admitted to the Rockford Center again from October 17 to October 30, 2007, and was again treated by Dr. Desai. (*Id.* at 258–60.) She was initially assessed with a GAF score of 15,[7] complaining of being "tired." (*Id.* at 258.) Dr. Desai noted that she was oriented but had a difficult time communicating and answering questions. (*Id.* at 259.) At discharge, she was assessed with a GAF score of 55 to 60, and Dr. Desai recommended ongoing medication and continued outpatient care with Dr. Patel. (*Id.* at 258–60.)

On March 26, 2008, Dr. Patel filled out a Mental Impairment Questionnaire ("MIQ") for Sherlock. (*Id.* at 246–51.) He assessed her with a GAF score of 50.[8] (*Id.* at 246.) Dr. Patel's MIQ stated that Sherlock had "more than a minimal limitation of ability to do any basic work activity." (*Id.* at 250.) According to Dr. Patel, increases in mental demands would likely cause

---

    Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (*e.g.*, stays in bed all day; no job, home, or friends)

[6] GAF scores from 61 to 70 indicate:
    Some mild symptoms (*e.g.*, depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[7] GAF scores from 11 to 20 indicate:
    Some danger of hurting self or others (*e.g.*, suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (*e.g.*, smears feces) OR gross impairment in communication (*e.g.*, largely incoherent or mute).

[8] Dr. Patel noted that this GAF score of 50 was the highest score Sherlock had demonstrated in the past year. (D.I. 15 at 246.) This observation appears to ignore Dr. Desai's assessed GAF score of 55 to 60, recorded during Sherlock's October 2007 hospitalization.

4

Sherlock to decompensate (*i.e.*, exhibit worsening symptoms and loss of functioning). (*Id.*) Dr. Patel concluded that Sherlock's "mood swings, periodic psychotic symptoms, anxiety of depression, and poor concentration" precluded her from sustaining a regular job. (*Id.* at 251.)

## B. <u>Vocational Expert</u>

Ms. Leviton, an impartial vocational expert, testified at Sherlock's hearing before ALJ Showalter. (*Id.* at 58–64.) Ms. Leviton testified that Sherlock's past work experience and skills would not be transferable to a new position. (*Id.* at 59.) Nonetheless, Ms. Leviton stated that a hypothetical person with Sherlock's impairments and limitations could perform simple, unskilled work, including: assembler for wet-wash (26,000 positions nationally, 300 locally); bagger for dry cleaning (65,000 positions nationally, 900 locally); and taper for printed circuit boards (56,000 positions nationally, 300 locally). (*Id.* at 60.) Ms. Leviton explained that these jobs required little interaction with others and that her recommendations were consistent with the *Dictionary of Occupational Titles*, published by the Department of Labor. (*Id.*)

## C. <u>ALJ Determination</u>

ALJ Showalter ruled that, in light of all the evidence, Sherlock was not disabled. ALJ Showalter acknowledged that Sherlock's bipolar disorder was a "severe" impairment as defined by 20 C.F.R. § 404.1520(c).[9] Nonetheless, ALJ Showalter concluded that Sherlock's bipolar disorder was not of "listing-level" severity; *i.e.*, it was not covered by 20 C.F.R. § 404, subpart P, appendix 1. (*Id.* at 11–13.) Moreover, Sherlock's impairments did not preclude her from obtaining light, unskilled work of the type identified by the vocational expert. (*Id.* at 14–17.) In reaching this decision, ALJ Showalter specifically rejected the recommendations of Dr. Patel, as

---

[9] ALJ Showalter also noted that she considered Sherlock's obesity a severe impairment, although Sherlock's irritable bowel syndrome ("IBS") was not severe. (D.I. 15 at 10.) Sherlock only challenges ALJ Showalter's ruling as it relates to her mental impairments; therefore, the court need not address these physical impairments.

5

set forth in his MIQ. (*Id.* at 13, 15.) Sherlock's inability to perform the semi-skilled tasks she once could did not affect ALJ Showalter's determination that Sherlock was "not disabled" and did not qualify for benefits. (*Id.* at 14–17.)

## III.  STANDARD OF REVIEW

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992); *see also Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, . . . [the court is] bound by those findings, even if . . . [it] would have decided the factual issue differently."). "Substantial evidence" means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The inquiry is not whether the reviewing court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

## III.  DISCUSSION

Sherlock argues that ALJ Showalter's decision is flawed because (1) ALJ Showalter's reasoning for rejecting Dr. Patel's opinion was inadequate, and (2) the vocational expert's testimony did not amount to substantial evidence. (D.I. 15 at 5–8.)

### A. Applicable Statute and Law

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

6

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner has promulgated regulations for determining disability by application of a five-step sequential analysis. *See* 20 C.F.R. § 404.1520. The ALJ, the reviewing Appeals Council, and the Commissioner evaluate each case according to this five-step process until a finding of "disabled" or "not disabled" is obtained. *See* § 404.1520(a). The process is summarized as follows:

1. If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2. If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, *and* has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4. If the claimant can still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."

5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not he or she is capable of performing other work in the national economy. If he or she is incapable, a finding of disability will be entered. Conversely if the claimant can perform other work, he will be found "not disabled."

*Cunningham v. Apfel,* No. 00-693-GMS, 2001 WL 1568708, at *4 (D. Del. Dec. 7, 2001) (paraphrasing the five-step process for determining disability).

The disability determination analysis involves a shifting burden of proof. *See Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983). In the first four steps of the analysis, the burden is on the claimant to prove every element of his or her claim by a

7

preponderance of the evidence. At step five, however, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment the claimant is able to perform. *See Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000); *see also Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); *Olsen v. Schweiker*, 703 F.2d 751, 753 (3d Cir. 1983). Substantial gainful employment is defined as "work that—(a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. When determining whether substantial gainful employment is available, the ALJ is not limited to consideration of the claimant's prior work, but may also consider any other substantial gainful activity which exists in the national economy. *See* 42 U.S.C. § 423(d)(1)(A), (2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

### B. Rejecting Dr. Patel's Opinion

Section 404.1527 of the Social Security Administration's regulations outlines the procedures for evaluating medical opinion evidence. 20 C.F.R. § 404.1527. Pursuant to the regulations, all medical opinions are considered "together with the rest of the relevant evidence ... receive[d]." § 404.1527(b). All medical opinions are weighed according to a number of factors, taking into account the nature of the relationship between the examiner and the applicant. § 404.1527(c). As a result, the opinions of a treating physician or healthcare provider are traditionally given "controlling weight," so long as they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." § 404.1527(c)(2).

ALJ Showalter's decision to discount Dr. Patel's MIQ assessment was expressly noted in her written decision and was supported by substantial evidence. (*Id.* at 13, 15.) ALJ Showalter

found that Dr. Patel's 2008 assessment conflicted with the record. In particular, ALJ Showalter found that Dr. Patel's conclusion that Sherlock exhibited "marked" difficulty in maintaining "concentration, persistence, or pace" was not documented anywhere in Dr. Patel's years of progress notes. (*Id.* at 13, 249.) Rather, Dr. Patel consistently focused on Sherlock's mood swings—which he described as stable and under "good control" (*Id.* at 252–55)—and anxiety—which he described as "mild." (*Id.*) Until his MIQ assessment (shortly before Sherlock's hearing with ALJ Showalter), Dr. Patel did not appear to have ever evaluated Sherlock's concentration for the purpose of determining her ability to work. In contrast, other medical opinions on record—from Drs. Simon, Fugate, and Okine-Tucker—all were in agreement that Sherlock could maintain a job entailing only simple tasks. (*Id.* at 181, 198, 241.) In light of the record before her, ALJ Showalter's decision not to afford "controlling weight" to Dr. Patel's MIQ assessment was supported by substantial evidence. *See* SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported . . . . Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is 'not inconsistent' with the other substantial evidence in the case record.").

Sherlock appears to misinterpret ALJ Showalter's reasoning, thus making Sherlock's reliance on *Brownawell v. Commissioner of Social Security* misplaced. 554 F.3d 352 (3d Cir. 2008). Sherlock is correct that *Brownawell* stands for the position that "a doctor's observation that a patient is 'stable and well controlled with medication' during treatment does not necessarily support the medical conclusion that the patient can return to work." *Id.* at 356 (internal quotation marks and alterations omitted) (quoting *Morales v. Apfel*, 225 F.3d 310, 319

9

(3d Cir. 2000)). ALJ Showalter, however, did not reject Dr. Patel's MIQ recommendation simply because he had previously described Sherlock's mood swings as "stable" or her anxiety as "mild." Rather, she emphasized Dr. Patel's notes concerning Sherlock's mood swings and anxiety to make clear the absence of any evaluation of Sherlock's concentration as it related to her ability to work. Thus, Dr. Patel's opinion that Sherlock exhibited marked limitations in concentration was not "well supported" by his own progress notes. ALJ Showalter's stated reasoning for rejecting Dr. Patel's opinion was not inadequate, and her finding that Sherlock's impairment did not satisfy listing-level severity was supported by substantial evidence.

### C. Vocational Expert Testimony

Sherlock also argues that the vocational expert was not presented with the full extent of Sherlock's limitations, and therefore Ms. Leviton's identified jobs were not supported by substantial evidence. ALJ Sherlock posed the following hypothetical to Ms. Leviton:

> [I]f we consider a hypothetical person who is about [t]he claimant's stated age at onset . . . ; this person has a 12-grade education and the work history that you just talked about. There are certain underlying impairments that place limitations on the ability to do work-related activities. . . . There are no exertional limitations. . . . In this hypothetical, this person, although [she] has a semi-skilled work background, [would be limited] to *simple, unskilled work* . . . that would not be at a production pace. To me, that means . . . *[l]ow-stress work, defined as only occasional changes in the work setting, and only occasional need to make decisions or to use judgment.* . . . In your opinion, would there be any simple, unskilled work such a person could do, that would fit within the parameters of the hypothetical . . . ?

(D.I. 15 at 59–60 (emphasis added).) Sherlock contends that the stated hypothetical did not fully capture the limitations presented by the record. She identifies thirteen additional limitations—drawn from the evaluations of Drs. Simon and Fugate—that she argues should have been posed

to Ms. Leviton. (D.I. 7–8.) Sherlock argues that ALJ Showalter's failure to state these limitations expressly rendered Ms. Leviton's recommendation deficient.

In posing a hypothetical question to the vocational expert, the ALJ must include limitations that are supported by the record. *Chrupcala v. Heckler*, 829 F.2d 1269, 1376 (3d Cir. 1987) ("A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."). Sherlock contends that, in their evaluation, Dr. Simon and Dr. Fugate described several limitations that ALJ Showalter failed to incorporate into her functional capacity determination. But the court agrees with the Commissioner that Sherlock's thirteen enumerated "limitations" did not need to be expressly presented to Ms. Leviton. ALJ Showalter's stated functional capacity—"simple, unskilled work . . . [l]ow-stress work, defined as only occasional changes in the work setting, and only occasional need to make decisions or to use judgment"—accurately conveys the impairments described by Dr. Simon and Dr. Fugate. In her written decision, ALJ Showalter outlined the medical opinion evidence of record and explained how—taking all the evidence into account—she arrived at her residual functional capacity determination. (*Id.* at 15.) The stated "mild" to "moderate" impairments are not preclusive of Sherlock's ability to perform simple, unskilled work, and therefore ALJ Showalter's hypothetical was proper. Ms. Leviton's expert testimony constitutes substantial evidence in support of ALJ Showalter's ultimate decision.

V.  **CONCLUSION**

ALJ Showalter's findings were supported by evidence a "reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. Thus, the court will grant

11

the Commissioner's motion for summary judgment (D.I. 20), and deny Sherlock's motion for summary judgment. (D.I. 16.)

Dated: January **30**, 2015

_____
UNITED STATES DISTRICT JUDGE